In re **FRONTIER AIRLINES, INC.,** Frontier Leaseco One, Inc., Frontier Leaseco Two, Inc., Frontier Holdings, Inc., Debtors.

Bankruptcy No. 86–B–8021E.

United States Bankruptcy Court, D. Colorado.

June 27, 1988.

Carl A. Ecklund, Roath & Brega, P.C., Denver, Colo., for debtor, Frontier Airlines.

Patricia D. McGraw, Fairfield & Woods, Denver, Colo., for creditor, Glenn L. Ryland.

## OPINION AND ORDER DISALLOWING GLENN L. RYLAND'S CLAIM FOR DIRECTORS AND OFFICERS LIABILITY INSURANCE

RAY REYNOLDS GRAVES, Chief Judge.

Debtors object, under section 502(b) of Title 11, to Glenn L. Ryland's ("Ryland") $10,000,000 claim for directors and officers liability insurance coverage which Ryland alleges Frontier Airlines, Inc. agreed to provide him. After consideration of Ryland's Proof of Claim, the briefs and exhibits submitted by counsel for the interested parties, the arguments presented at hearing, and the court's independent research, the court issues the following findings of fact and conclusions of law only as to Ryland's liability insurance claim.

Ryland distinguishes his insurance "rights" from any separate commitment Frontier made to defend, protect, and indemnify him. Counsel for Ryland acknowledges, moreover, that "[s]ince no claim has yet been asserted against Mr. Ryland, he has, at present, no claim for indemnification to assert against the Debtors; indeed, if such a claim were to be asserted by Mr. Ryland at this time, it would be subject to disallowance pursuant to Section 502(e)(1)(B)." (Memorandum Brief in Support of Claim at pg. 3).

The issue presented by Ryland's claim, then, is whether Frontier breached an obligation under the Agreement to provide Ryland with directors and officers liability insurance after July 1, 1985. If it did, the court must decide how to value any allowed claim for insurance.

Frontier and Ryland terminated their February 2, 1982 Employment and Consulting Agreement by an Agreement dated July 16, 1985, effective on July 1, 1985. Frontier's president and Ryland signed an Agreement that was "authorized by the Board of Directors of FAL and FHI as binding upon … FAL and FHI …" (Par. 14 of Agreement, Frontier Exhibit G).

Ryland contends that par. 12 of the Agreement embodies Frontier's "well-documented, written representation and agreement" to provide Ryland with liability insurance and that par. 12 was "bargained for and relied upon" by Ryland. (Ryland's Memorandum Brief in Support of Claim at pg. 6). Paragraph 12 appears at pg. 4 of the Agreement as follows:

> Ryland's rights to defense, protection, and indemnification with respect to his services as officer and director under Frontier's bylaws and insurance policies for the period of his employment by Frontier will be honored.

The Ryland–Frontier Agreement sets forth Ryland's rights to other benefits in par. 9 as follows:

Ryland will be accorded all benefits that are *in fact provided by Frontier to its retired chief executive officers as of July 1, 1985, including but without limitation* benefits under any health insurance plans maintained by Frontier and airline pass benefits. Ryland will be accorded the status of a chief executive officer who retired in good standing. (emphasis added)

Ryland maintains that his claim against Frontier is noncontingent, arguing that Frontier breached a contractual obligation expressed in par. 12 when it cancelled insurance policies in effect on July 1, 1985. (See Frontier Exhibits A–E) He also contends that he, as an individual, cannot obtain the liability insurance for himself. On this basis, he seeks either insurance coverage or the value of the coverage ($10,000,-000).

As support for his claim that Frontier agreed to maintain liability insurance coverage for him after July 1, 1985, and not merely *during* the period of his employment, Ryland emphasizes that he contractually ended his relationship with Frontier over six months after his November 1984 resignation as an officer and director of Frontier. He stresses that par. 12 of the Agreement specifically states that "Ryland's rights to ... insurance policies ... *will* be honored." (emphasis added) Had Frontier's obligation to provide liability insurance been limited to coverage *during* his period of employment, Ryland contends, inclusion of par. 12 would have been needless.

Therefore, Ryland submits that par. 12 expresses Frontier's promise to honor, in the future, "Ryland's rights to defense" and "Ryland's rights ... with respect to his services as officer and director under Frontier's ... insurance policies" and that Frontier further promised to honor, in the future, "Ryland's rights ... under Frontier's ... insurance policies for the period of his employment by Frontier ..." In other words, Ryland says he thought Frontier would provide "continuing" insurance coverage for claims relating to Ryland's

services as an officer and director of Frontier.

Ryland and Frontier refer to the Frontier insurance policies in effect on July 1, 1985. Liberty Mutual Fire Insurance Company issued two policies covering Frontier's directors and officers from November 11, 1984 to November 11, 1985. (Frontier D, E) In addition, a third Frontier policy issued by National Union Fire Insurance Company of Pittsburgh (Frontier F) was effective from November 11, 1984 to November 11, 1985. Under the first two policies (Frontier D, E), a section styled Definitions (a)(1), as amended by par. 1 of the Standard Amendatory Endorsement to the policies effective from November 11, 1984 to November 11, 1985, sets forth the persons covered as follows:

1. Clause 2(a) is deleted in its entirety and the following is substituted therefor;

2. (a) "Director or Officer" means any duly elected Director or duly elected or appointed Officer of the Company and Subsidiaries, and all Divisional officers holding the title of Vice President or above.

Although the Frontier D and E policies contain identical definitions of directors and officers, the insuring clauses differ. The insuring clause for the Directors and Officers Liability Policy (Frontier D) states:

This policy shall pay on behalf of each person *who was or is or may hereafter be* a Director or Officer of the Company (hereinafter called the "Insured") the Insurer's proportionate share or loss in excess of the Insured's Retention arising from any claim made against the Insured during the policy period by reason of any Wrongful Act done while acting in *his* capacity as such. (emphasis added)

The insuring clause for the Reimbursement Policy for Directors and Officers Liability (Frontier E) states:

This policy shall pay on behalf of the Company the Insurer's proportionate share of loss ... *arising from any claim made during the policy period against any person who was or is or may hereafter be a Director or Officer*

*of the Company* ... but only when such Director or Officer shall be entitled to indemnification pursuant to the law or the charter or bylaws of the Company ...

A bankruptcy judge, in determining the validity of a claim, looks to state or non-bankruptcy federal law. *In re Spanish Trails Lanes, Inc.,* 16 B.R. 304, 306 (Bankr.D.Ariz.1981). Therefore, a party claiming a right to payment under the Bankruptcy Code "must do so in accordance with such contractual rights against the debtor" as may have been acquired before the commencement of the case. *In re Credit Industrial Corporation,* 366 F.2d 402, 407 (2nd Cir.1966).

Colorado has adopted the Restatement Second, Conflict of Laws approach for contract actions. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444, 601 P.2d 1369 (1979). Under this approach, the parties' choice of governing law controls even issues of validity if the chosen state has a substantial relationship either to the parties or to the transaction and there is a reasonable basis for the choice. Restatement Second § 188(2)(a) (1971). In the Ryland–Frontier Agreement, the parties included an express choice-of-law clause, providing that,

> 17. This agreement is executed and delivered in the State of Colorado and its validity, construction, and enforcement shall be governed entirely by the laws of this state.

This court finds that Colorado has a "substantial relationship" both to the parties and the transaction. Although Frontier is a Nevada corporation, its headquarters are in Denver, Colorado. The parties executed, delivered and performed under the Termination Agreement in Colorado. Finally, Ryland lives in Denver. Therefore, Colorado law guides the bankruptcy court in determining this Agreement's validity, in interpreting the Agreement, and in otherwise deciding the validity and amount of Ryland's claim against Frontier.

Under fundamental rules of contract law, courts try to ascertain and give effect to the mutual intent of contracting parties. The court must, however, determine the meaning of the July 16 Agreement before deciding the validity of Ryland's claim. The Ryland–Frontier Agreement contains an integration clause which, if respected, precludes consideration of evidence of earlier or contemporaneous agreements that vary or contradict the terms of the writing. The clause appears as par. 16 as follows:

> 16. This agreement contains the entire understanding of Frontier and Ryland with respect to its subject matter. No representations or promises about that subject matter have been made that are not contained in this Agreement.

The Court may, despite this clause, consider "any evidence tending to explain or clarify the intent and purpose of the parties" when deciding whether the parties have assented to a particular writing as the "entire understanding" or complete and accurate expression of their agreement. See *Miller v. Fulenwider, Inc.,* 146 Colo. 588, 362 P.2d 570, 574 (1961), in which the Colorado Supreme Court cited 3 *Corbin on Contracts* (1960 ed.) § 573, p. 357 with approval. As Professor Corbin explained the parol evidence rule,

> Even if a written document has been asserted to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by [extrinsic evidence].

Id. at 412–13 (1961).

After examination of the Agreement and Frontier's insurance policies submitted as Exhibits A–G, this Court finds that Ryland and Frontier did not, on July 16, 1985, regard the six page Agreement as the entire understanding or complete expression of their agreement. Rather, the Court concludes that Frontier and Ryland intended to incorporate other agreements existing on July 1, 1985 into the Termination Agreement. For example, the Agreement says, in par. 9, that Frontier agrees to give Ryland "all benefits that are *in fact* provided

by Frontier to its retired chief executive officers as of July 1, 1985, including but without limitation benefits under any [of Frontiers'] health insurance plans." (emphasis added) Moreover, in par. 12, Frontier promises to honor Ryland's rights "under Frontiers's bylaws." The court could not, without reference to other evidence, determine what benefits Frontier "in fact" provided retired chief executive officers on July 1, 1985. Similarly, it could not, without examining Frontier's bylaws, know what rights Ryland had under those by-laws.

The Colorado Supreme Court further recognizes the relevancy of extrinsic evidence in discerning the intentions of contracting parties. When a trial court, after examining a provision or entire agreement, decides that the terms are ambiguous, it may consider other evidence. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748 (1978). A contractual provision is ambiguous when it is "so uncertain in phraseology as to be susceptible of two reasonable interpretations: one favorable to [Ryland] and the other favorable to [Frontier]." *Massachusetts Mutual Life Insurance Company v. DeSalvo*, 174 Colo. 115, 482 P.2d 380 (1971).

■ In the case at bar, counsel for Frontier argues that the language of par. 12 clearly says that Frontier's obligation to provide directors and officers insurance ended when Ryland's employment by Frontier ended. Counsel for Ryland, on the other hand, says par. 12 means that Frontier agreed to honor Ryland's rights to "insurance policies" in the future and agreed to provide him with insurance "with respect to his services as officer and director ... [i.e. coverage] for the period of his employment." Because the court cannot find that par. 12 clearly and definitely states either the nature of the "insurance policies" Frontier promised to honor or the time period during which or for which Frontier expected to provide Ryland with liability insurance, the court holds, as a matter of law, that par. 12 is vague and ambiguous. *Gran Prix Imports, Inc. v.*

*Buckley Bros. Motors, Inc.*, 633 P.2d 1085 (Colo.App.1979), *rev'd on other grounds*, 633 P.2d 1081 (Colo.1981).

The meaning Ryland and Frontier intended for par. 9 and par. 12, then, is for the court to determine based on its interpretation of the language within the four corners of the Termination Agreement and also within the Directors and Officers liability insurance policies in effect on July 1, 1985. See Exhibits D–F.

A close inspection of par. 9, par. 12, and the Directors and Officers liability insurance policies (Frontier D–F) enables the court to make the following findings regarding Ryland's rights under the July 16 Termination Agreement. Frontier agreed to honor Ryland's rights to insurance policies. The Agreement also entitled Ryland to any benefits Frontier provided retired chief executive officers on July 1, 1985. One benefit those retired officers received was protection under directors and officers liability policies submitted as Frontier Exhibits D, E, and F. Ryland, a chief executive officer who retired in good standing, qualified under the Insuring Clauses of Frontier policies (Exhibits D and E) as a "person who was ... a Director or Officer of the Company" and, therefore, was protected.

According to Exhibits D and E, Frontier had, on July 1, 1985, policies effective between November 11, 1984 and November 11, 1985. Therefore, under the doctrine of "performance within a reasonable time," Ryland, on July 16, 1985, could have expected that Frontier would continue to provide him with liability insurance through November 11, 1985. *Shull v. Sexton*, 154 Colo. 311, 390 P.2d 313 (1964). Beyond this, the court cannot find that the Termination Agreement or the directors and officers liability policies existing on July 1, 1985 imposed a continuing duty upon Frontier to provide Ryland with directors and officers liability insurance. Frontier, therefore, on July 16, 1985, could have expected relief from the insurance obligations on November 11, 1985. Ryland's testimony as to his expectations and beliefs does not explain or clarify the intent of the parties.

■ Courts have no authority to rewrite contracts and then compel a party to fulfill a duty for which he did not contract. *Radiology Prof. Corp.*, 577 P.2d at 751. Clearly, no specific language in the Termination Agreement addresses any commitment Frontier made to provide directors and officers liability insurance in any certain amount or for any designated time period. The parties could have negotiated and included, in detail, any duty Frontier had to maintain insurance indefinitely or any duty Frontier had to notify Ryland if it decided to cancel the existing policies. They did not.

Therefore, the court concludes that, by maintaining the policies until November 11, 1985, Frontier fulfilled its promise to honor Ryland's insurance rights as expressed in par. 9, 12, and Exhibits D, E and F. This court, as a result, must and does disallow in full Glenn L. Ryland's claim for directors and officers liability insurance.

IT IS SO ORDERED.