23CA1785 Sisters v ACM 09-19-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1785
City and County of Denver District Court No. 22CV31321
Honorable Martin F. Egelhoff, Judge

Sisters of Color United for Education, d/b/a HEAL Denver, a Colorado
nonprofit corporation,

Plaintiff-Appellee,

v.

ACM Park Hill JV VII, LLC, a Delaware limited liability company,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 19, 2024

Achieve Law Group, LLC, Aaron A. Boschee, Jerome A. DeHerrera, David C.
Kelley, Benjamin P. Meade, Denver, Colorado, for Plaintiff-Appellee

Holley, Albertson & Polk, P.C., Dennis B. Polk, Eric E. Torgersen, Lakewood,
Colorado, for Defendant-Appellant

¶ 1    Defendant, ACM Park Hill JV VII, LLC (ACM), appeals the trial court's judgment in favor of plaintiff, Sisters of Color United for Education, d/b/a HEAL Denver (Sisters of Color).  We affirm the judgment.

## I.    Background and Procedural History

¶ 2    This appeal arises out of a lease relationship between ACM and Sisters of Color.  The dispute centers on whether Sisters of Color was entitled to occupy the clubhouse[1] on Park Hill Golf Course (golf course) without paying rent until such time as Sisters of Color had recouped the value of significant improvements that it paid for to renovate the clubhouse.  The negotiations and representations among the parties and their principals led to the creation of the disputed lease.  Many of the entities involved in these negotiations acted through specific individuals, some of whom acted on behalf of multiple entities.

¶ 3    To assist the reader in understanding the interplay between the entities and individuals involved, we include the following table:

---

[1] The record is not clear whether the leased premises included all or a portion of the clubhouse.

| Entity | Employees | Role |
|---|---|---|
| Sisters of Color | Adrienna Lujan | Executive Director |
| ACM | Kenneth Ho | Golf course manager |
| Westside Investment Partners (Westside) | Kenneth Ho Megan Waldschmidt | Principal Vice President |
| Holleran Property Management and Development, LLC (Holleran) | Norman Harris Tyrone Hubbard | Manager Executive |

## A. Agreement Between the Parties

¶ 4    At the completion of a bench trial, the court entered a detailed and thoughtful order, which includes the following factual findings.

¶ 5    ACM is a limited liability company. In 2019, ACM acquired title to the golf course. The golf course and clubhouse were in a state of disrepair when ACM took possession of the property. Particularly, the clubhouse was severely dilapidated, was overrun with rodents and pests, had standing gray water in the kitchen, and had mold damage. Rather than fronting the costs of renovating the property, ACM sought tenants who were willing to pay for clubhouse improvements in exchange for free or reduced rent until the expenses for the improvements were recovered.

¶ 6    Westside is a part owner of ACM.  The trial court found that Westside "controls [the golf course] and development project, including ACM."

¶ 7    Sisters of Color is a nonprofit corporation with the broad mission to provide services to underserved communities.  Sisters of Color was looking for rental space to locate its operations.

¶ 8    In spring 2020 ACM, Harris, and Hubbard worked together informally to organize meetings to develop community support for the development of the golf course, including the clubhouse. Hubbard invited Lujan to the community meetings.

¶ 9    In October 2020 Westside and ACM hired Holleran as a consultant to find prospective tenants.  Holleran received a monthly commission and an equity interest in the development as a part of the agreement.  Hubbard met with representatives of ACM/Westside weekly to discuss the status of the efforts to develop and lease the clubhouse.

¶ 10    In November 2020 Hubbard and Lujan started seriously discussing the terms of a potential lease between ACM and Sisters of Color.  With respect to these negotiations, the trial court found as follows:

> Due to its dilapidated condition and Holleran and ACM/Westside's position on renovations, it was the clear expectation and intent of Ms. Lujan that Sisters of Color would fund and oversee the necessary renovations required to render the [c]lubhouse suitable for community use in lieu of rental payments. That was likewise the clear and expressed intent of Hubbard, acting on behalf of Holleran, as well as ACM/Westside.

¶ 11 In anticipation of Sisters of Color commencing work on the clubhouse, Waldschmidt emailed Lujan a form lease agreement that she intended Hubbard to use in preparing a lease with Sisters of Color. In February 2021 Holleran executed a three-year lease with Sisters of Color. The lease was based on the standard form but unbeknownst to Hubbard and Sisters of Color, the lease did not reflect their negotiated agreement that Sisters of Color would be reimbursed for the cost of improving the clubhouse through rental credits. As the trial court explained:

> Despite all parties' intent and expectation that renovation costs would be funded by Sisters of Color in lieu of rent, the agreement as executed contained a base rent over a three-year lease term of $30,00[0] for the first year, $36,000 for the second year, and $42,000 for the third year. Mr. Hubbard testified credibly that the provision was added to reflect Sister[s] of Color's offsetting payments for the amount of work that it would subsequently fund for

4

[c]lubhouse improvements, but that the amounts would be "zeroed-out" by the renovation costs. The base rate, totaling $108,000 over the three-year period, was based upon Sister[s] of Color's estimated renovation costs, with an expectation that an addendum modifying the base rent would later be executed to reflect the actual renovation cost.

Contrary to the parties' intent, the executed lease also included provisions stating that the tenant accepted the property "AS-IS, WHERE IS AND WITH ALL FAULTS" and that any improvements to the premises would be paid for by the tenant.

¶ 12 In accordance with its understanding of the lease agreement, Sisters of Color paid for the renovations to the clubhouse, including addressing electrical, plumbing, and structural issues, and mold and vermin remediation. In total, Sisters of Color spent $196,157.06 on the renovations.

¶ 13 Ho, Hubbard, and Waldschmidt met weekly to discuss Sisters of Color's progress on the renovations. Waldschmidt represented to a potential renter that the clubhouse was temporarily closed from February until April for "much needed repairs and improvements." In March 2021, in anticipation of the renovations — and with ACM's prior conferral and approval — Hubbard and Harris

published an editorial in the *Denver Post* discussing Sisters of Color's renovation efforts. The editorial stated that Westside and Holleran were working as "codevelopers."

¶ 14 At no point during the construction process did ACM, Westside, or Holleran object to the improvements that Sisters of Color funded.

## B. Post-Renovation

¶ 15 In June 2021, Sisters of Color attempted to hold a meeting in the newly renovated space but was told that another group had been in contact with Westside and was given permission to use the space at the same time. When Lujan called Waldschmidt to discuss the double booking, Waldschmidt told her that Sisters of Color had no right to use the space until it entered into a new lease agreement. That August, Sisters of Color tried to use the clubhouse for another event and was again told that it could not use the renovated space.

¶ 16 At around the same time, Sisters of Color reviewed the lease agreement and realized that it did not contain a provision addressing the reimbursement of its expenditures on the clubhouse through rental credits. Throughout the summer, the parties

attempted to renegotiate the lease, but they were unable to reach an agreement.

## C. Trial and Subsequent Appeals

¶ 17  Sisters of Color's complaint named ACM and Holleran as defendants. Sisters of Color asserted nine claims[2] for relief, including — in pertinent part — an unjust enrichment claim against Holleran and ACM and a breach of contract claim against Holleran.[3] Sisters of Color requested an award of damages in the amount of the improvements it paid for and costs.

¶ 18  In response, ACM claimed that Sisters of Color could not maintain any direct claims against it because Holleran lacked actual and apparent authority to act on ACM's behalf, Holleran's

---

[2] In addition to the breach of contract and unjust enrichment claims at issue on appeal, the complaint asserted seven additional claims: tortious interference (against ACM); promissory estoppel (against Holleran); civil theft (against Holleran); conversion (against Holleran); constructive eviction (against Holleran); breach of the implied covenant of quiet enjoyment (against Holleran); and vicarious liability. Before the trial, Sisters of Color withdrew its civil theft, conversion, and constructive eviction claims against Holleran. The trial court dismissed the tortious interference claim against ACM at the completion of the evidence.

[3] The trial court entered judgment against Holleran on Sisters of Color's promissory estoppel claim; however, we do not address the claim's merits because Holleran dismissed its appeal.

conduct could not be attributed to ACM, and Sisters of Color acted at its own peril by making the clubhouse improvements.

¶ 19    In resolving the parties' claims, as material on appeal, the trial court specifically found as follows:

- ACM, Westside, Holleran, and Sisters of Color understood and agreed that Sisters of Color would facilitate the clubhouse renovations and that the costs incurred by Sisters of Color would be in lieu of rent.

- The lease agreement between ACM and Sisters of Color mistakenly failed to incorporate a provision that added base rental payments to reflect the value of the anticipated renovation costs. Thus, the February 2021 executed lease agreement failed to include the agreement's essential terms; and therefore, there was not an enforceable contract.

- Because the lease agreement was not an enforceable contract, Sisters of Color's breach of contract claim failed.

The trial court entered judgment in Sisters of Color's favor on its unjust enrichment claim, finding as follows:

- Sisters of Color's tenant improvements enhanced the clubhouse by making the property suitable for ACM's and its subsequent tenants' use.

- An appreciable portion of the clubhouse improvement costs — including plumbing, electrical, and mold and vermin remediation — are readily apparent.

- It would be unjust to allow ACM, Westside, and Holleran to retain the benefit conferred by Sisters of Color without paying its value.

- The value of the improvements conferred by Sisters of Color to ACM's benefit was $196,157.06 — the total amount Sisters of Color paid for the improvements to the clubhouse.

The trial court held Holleran and ACM jointly and severally liable for $196,157.06 and awarded costs and postjudgment interest.

¶ 20    ACM and Holleran appealed the trial court's judgment. ACM also separately appealed the trial court's award of postjudgment

interest and costs.[4]  Holleran was dismissed from the appeal, so we only address ACM's claims of error.

## II.  Analysis

¶ 21    As a threshold matter, ACM contends that the trial court erroneously concluded that the lease agreement between Sisters of Color and ACM was not an enforceable contract.  If the lease agreement is valid, ACM's argument continues, then the unjust enrichment claim fails as a matter of law.  ACM also contends that the trial court erred by concluding that Sisters of Color established its unjust enrichment claim.  We address these issues in turn.

### A.    Standard of Review and Applicable Law

¶ 22    If a written document is a complete and accurate expression of the agreement between the contracting parties, then the court may not admit evidence that varies or contradicts the essential terms of the written document.  *Aztec Sound Corp. v. W. States Leasing Co.*, 510 P.2d 897, 898-99 (Colo. App. 1973).  The rule does not apply to writings that do not contain all the terms and conditions of the parties' agreement.  *Id.*  If the court determines that the written

---

[4] We separately address ACM's postjudgment interest and cost arguments in Case No. 23CA2129.

10

agreement fails to include the essential terms of an agreement, it may admit parol evidence — including the parties' conduct — to determine the intent of the parties. *Harmon v. Waugh*, 414 P.2d 119, 121 (Colo. 1966). Resolution of that disputed evidence presents a question of fact that we review for clear error. *See E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000).

¶ 23 We review de novo whether the trial court applied the proper legal test for determining whether a party has established its claim for unjust enrichment. *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 26. "Unjust enrichment is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another." *Martinez v. Colo. Dep't of Hum. Servs.*, 97 P.3d 152, 159 (Colo. App. 2003). To prevail on an unjust enrichment claim the plaintiff must show that "(1) at the plaintiff's expense, (2) the defendant received a benefit, [and] (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Id.*

¶ 24 When a trial court resolves factual disputes to apply the elements of an unjust enrichment claim, we review such factual

11

findings for clear error. *R.A.S. Builders, Inc. v. Euclid & Commonwealth Assocs.*, 965 P.2d 1242, 1243 (Colo. 1998).

B.     The Enforceability of the Lease

¶ 25     In concluding that the lease failed as a matter of law, the trial court found,

> [T]he evidence overwhelmingly establishes that the clear intention of ACM/Westside, in conjunction with its de facto partner and co-developer Holleran, was to engage one or more non-profit organizations to renovate and activate the dilapidated [c]lubhouse for community uses, as an essential component of their broader development of the [golf course]. The evidence clearly establishes that ACM/Westside, Holleran, and Sisters of Color all understood and agreed that the ultimate tenant, here Sisters [of Color], would have broad discretion to facilitate the [c]lubhouse renovations and that the costs of such renovations would be incurred by Sisters of Color in lieu of rent.

These findings enjoy record support and we are bound by them on appeal. *See Lyon v. Amoco Prod. Co.*, 923 P.2d 350, 355 (Colo. App. 1996).

¶ 26     Despite the parties' clear intent, the court found that "the form lease agreement that was ultimately executed by the parties included provisions that were contrary to the express intentions of

12

the parties, particularly as they pertained to Sisters' rights and obligations regarding improvements to the facility."

¶ 27 Based on its findings, which are supported by the record, the trial court concluded "that the written instrument executed by the parties on February 4, 2021, fails to include essential terms contemplated by the parties" and therefore "cannot form the basis of an enforceable contract by any party to this action." We perceive no error in this conclusion.

¶ 28 We also reject ACM's argument that the trial court erred by admitting parol evidence in light of the lease's integration clause. As the supreme court has explained,

> [W]hen a contract has been expressed in writing, to which both parties have assented as a complete and accurate expression of their agreement, evidence, whether parol or otherwise, of antecedent understandings and negotiations is not admissible for the purpose of varying or contradicting the terms of the writing. But where, as here, the issue is whether the parties have made a contract, and whether such contract is expressed in a particular writing and, if so, whether the writing has been assented to as the complete and accurate expression of their agreement, any evidence tending to explain or clarify the intent and purpose of the parties is admissible.

*Miller v. L. C. Fulenwider, Inc.*, 362 P.2d 570, 574 (Colo. 1961). The trial court's admission of the parol evidence in this case was consistent with these principles.

¶ 29 We discern no error in the trial court's findings of fact, or in its legal conclusion that the lease was unenforceable as a matter of law because it failed to express the intention of the parties. *See Harmon*, 414 P.2d at 121.

### C. The Unjust Enrichment Claim

¶ 30 ACM argues that the trial court erroneously found that Sisters of Color satisfied the elements of its unjust enrichment claim. As previously noted, the claim required proof that (1) at Sisters of Color's expense; (2) ACM received a benefit; and (3) under circumstances that would make it unjust for ACM to retain the benefit without paying. *See Martinez*, 97 P.3d at 159.

¶ 31 It is undisputed that Sisters of Color paid $196,157.06 for the clubhouse improvements, so the first element is satisfied.

### 1. The Received Benefit

¶ 32 As it relates to the second element, we perceive no error in the trial court's conclusion that ACM received a benefit from Sisters of Color's renovations. As best we understand its argument, ACM

14

contends that Sisters of Color made the renovations for its specific purpose and that the improvements did not benefit ACM. Relatedly, ACM argues that the trial court erred by equating the amount spent on the improvements with the unjust benefit bestowed on ACM. We disagree with both contentions.

¶ 33 The trial court found that "the tenant improvements performed by Sisters of Color enhanced the value of the property by making previously unusable spaces within the [c]lubhouse suitable for use by . . . ACM/Westside and/or its subsequent tenants." Prior to the renovations, the clubhouse had numerous structural and cosmetic deficiencies. Sisters of Color paid to fix these defects. Moreover, the objective benefit of the improvements was manifested by ACM's ability to lease the improved space to third-party tenants once Sisters of Color was no longer allowed to use the clubhouse. And the subjective value of the improvements was reflected by the fact that ACM began using the space shortly after Sisters of Color was forced out.

¶ 34 Based on these findings the court concluded that "to place Sisters of Color in the position it previously occupied requires that the parties in receipt of the benefit conferred, here ACM/Westside

15

and Holleran, compensate Sisters for the total amount of $196,157.06 that it expended in renovating and improving the . . . [c]lubhouse." Given the trial court's findings, we cannot conclude that it erred by equating the cost of the improvements paid for by Sisters of Color with the value conferred upon ACM.

## 2. The Unjust Benefit

¶ 35 Finally, as it relates to the third element, we reject ACM's contention that the trial court erred by concluding that it would be unjust for ACM to retain the benefits of the clubhouse renovation without paying Sisters of Color for the costs of the improvements.

¶ 36 ACM mistakenly relies on *DCB Construction Co. v. Central City Development Co.*, in which the supreme court held that in some situations involving tenant improvements, a landlord may not be held responsible on a theory of unjust enrichment unless the landlord has engaged in "improper, deceitful, or misleading conduct." 965 P.2d 115, 122 (Colo. 1998). The supreme court developed the rule in recognition of the fact that tenants often contract for improvements to a leased property independently of any involvement or wrongful action by the landlord. *Id.* at 121. In such circumstances, even though there may be some benefit to the

16

landlord, the court reasoned it would be inequitable to saddle a landlord with the obligation of being a de facto guarantor of any improvements procured by a tenant. *Id.*

¶ 37 But the supreme court later clarified that the rule it articulated in *DCB* does not apply to all unjust enrichment claims arising out of a tenant's payment for improvements to a leased property. *See Lewis v. Lewis*, 189 P.3d 1134, 1142 (Colo. 2008). Rather, the rule is limited to situations in which the tenant improvements were made without any involvement or wrongdoing by the landlord. *See id.*

¶ 38 The trial court recognized these principles and then applied them to the unique factual circumstances of this dispute. In contrast to the scenario addressed in *DCB*, the trial court recognized that in this case, the subject improvements were not undertaken independently of ACM. The trial court reasoned that

> the very essence of ACM and Holleran's business model was to facilitate the development and ultimate usage of the [c]lubhouse through tenant-funded renovations in lieu of rental payments. Unlike *DCB* . . . , where the risk of loss among two "innocent" parties must be allocated, the parties in this case clearly anticipated that Sisters of Color would confer a benefit to the

17

property and its owners/landlords through its expenditures for renovations, and thereafter recoup the reward of the benefit via its utilization of the space.

¶ 39    As the trial court found, ACM was fully aware of and supported Sisters of Color's renovations.  Indeed, it actively pursued a tenant like Sisters of Color to front the improvement costs in exchange for future use of the clubhouse without the obligation to pay rent until the value of the improvements had been recouped.

¶ 40    ACM — both through its agents and directly— was aware that Sisters of Color paid for the improvements pursuant to the very structure that ACM solicited.  Indeed, as the trial court found, "the claim in this case is being made by a purported tenant who, after fully compensating contractors for improvements made by the tenant *at the behest of the owner/landlord,* is seeking compensation for the benefit conferred upon the owner/landlord that was incurred at the tenant's expense and to its detriment."  Thus, the tenant improvements were not made independently of ACM and the factual predicate for the *DCB* rule is not present.

18

¶ 41     But even if the limited rule of *DCB* applied to this case, the trial court's factual findings support the conclusion that ACM engaged in "improper, deceitful, or misleading conduct" related to the tenant improvements.  ACM solicited a tenant who would front the cost of the tenant improvements, which Sisters of Color did.  ACM and its principals were aware of and approved the improvements as they were being constructed.  ACM was also aware that Sisters of Color would be permitted to use the leased premises rent free until such time as it had recovered the value of the expenditures it made for the tenant improvements.

¶ 42     Despite these circumstances, when Sisters of Color began to occupy the space, ACM denied the existence of a reimbursement agreement and refused to allow Sisters of Color to occupy the space unless it negotiated a new lease.  When Sisters of Color refused, ACM took over the leased space for its own operations and to obtain other tenants.

¶ 43     These findings support the conclusion that, at the very least, ACM engaged in "improper" or "misleading" conduct relative to the construction and subsequent use of the tenant improvements.  *See DCB*, 965 P.2d at 122.  Thus, we see no error in the trial court's

conclusion that "given the unique circumstances of this case, . . . having conferred the benefit of the enhanced value of the [c]lubhouse upon ACM . . . , it would be unjust for [ACM] to retain the benefit without commensurate compensation."

## III. Disposition

¶ 44    The trial court's judgment is affirmed.

JUDGE TOW and JUDGE PAWAR concur.